UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH LILYSTIMBERLAKE@YAHOO.COM THAT IS STORED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC. (DBA "YAHOO") | Case No. 21-MJ-5021<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR SEARCH WARRANT**

I, David J. Lowery, Special Agent of the Federal Bureau of Investigation, being duly sworn, depose and state that:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for search warrant for information associated with an account stored at the premises controlled by Oath Holdings, Inc. (dba "Yahoo"), headquartered at 701 First Avenue, Sunnyvale, California 94089. Specifically, the government seeks a warrant to review and seize information associated with Yahoo's e-mail platform. The requested warrant would require the Provider to disclose to the government copies of information associated with the following account ("Target Account"), more particularly described in Attachment A:

   a. Yahoo Account: LILYSTIMBERLAKE, which is associated with e-mail address: LILYSTIMBERLAKE@YAHOO.COM.

2. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), to require the Provider to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment

B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3. I am a Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, and have been so employed since July 2011. I am currently assigned to the Lexington Resident Agency, within the Louisville Division of the FBI, and am assigned to investigate white collar matters. I have received training from the FBI Academy in Quantico, Virginia, which covered a variety of investigative techniques, including interviewing, report writing, and an overview of legal statutes and criminal laws. I have personally conducted and assisted in investigations involving wire fraud, mail fraud, and bank fraud.

4. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1347 and 1349, health care fraud and conspiracy to commit health care fraud, 18 U.C.S. § 1028A, aggravated identity theft, have been committed by known and unknown persons. Among other things, there is probable cause to believe that the user(s) of the email account LILYSTIMBERLAKE@YAHOO.COM agreed to intentionally devise a scheme or artifice to defraud to obtain money from a health care benefit program, *see* 18 U.S.C. §§ 1347, 1349. There is also probable cause to believe that a search of the information described in Attachment A will find evidence, instrumentalities, contraband, and/or fruits of these crimes, as further described in Attachment B.

5. The matters set forth in this affidavit are either known personally to me or were related to me by other persons acting in their official capacities as law enforcement officers or employees of both domestic and foreign law enforcement agencies. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## JURISDICTION

6. Yahoo provides customers an "electronic communication service" as that term is defined by 18 U.S.C. § 2510(12), and/or a "remote computing service" as that term is defined by 18 U.S.C. § 2711(2). Thus, this Court has jurisdiction to issue the requested warrant, because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that . . . has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As described in the paragraphs below, my investigation indicates that several suspected illegal transactions described herein occurred in the Eastern District of Kentucky.

7. Yahoo has confirmed that, when acting as a remote computing service, Yahoo does not access the contents of any communications other than for storage or computer processing, or to comply with court orders. *See* 18 U.S.C. § 2703(b)(2).

## BACKGROUND ON YAHOO

8. Based on my training, investigation, and experience, I have am familiar with Yahoo's functionality. Yahoo provides web-based electronic mail ("e-mail") services to the general public in the form of "Yahoo Mail" accounts. Yahoo allows subscribers obtain e-mail accounts with the domain name "yahoo.com", like the e-mail account listed in Attachment A. These Yahoo mail accounts store electronic communications, including opened and unopened e-mail, and these accounts are maintained for Yahoo subscribers. Subscribers obtain an account by registering with the Provider. During this registration process, Yahoo asks subscribers to provide basic personal information. This information can include the subscriber's full name, alternate e-

mail address, telephone number, and credit card/banking information.[1]  Such information may constitute evidence of the crimes under investigation, because it can be used to identify the account's user or users.

9. In general, an e-mail that is sent to a Yahoo subscriber is stored in the subscriber's "mailbox" on Yahoo servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Yahoo servers indefinitely.  E- mail sent from the Yahoo accounts are transferred via the internet to Yahoo servers, and then transmitted to their end destinations.  Yahoo often saves a copy of the sent e-mail.  Unless the sender of the e-mail specifically deletes the e-mail from the Yahoo server, the e-mail can remain on the system indefinitely.  A Yahoo subscriber can also store files, including e-mails, address books, contact lists, "chat" logs, pictures, and other files, on servers maintained and/or owned by Yahoo.  In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, "chat" logs, e-mails contained within the account, and attachments to e-mails, including pictures and files.

10. When activating a Yahoo email account, a subscriber can provide a recovery e-mail address to be associated with the newly opened or active Yahoo account.  Yahoo will use the recovery email address for notification purposes, to verify that suspicious logins to a Yahoo account are authorized by the user, and to reset Yahoo account passwords.  For suspicious logins, the recovery email address is contacted when the Yahoo account is accessed using a new IP address or from unusual locations.  To reset passwords, Yahoo will send the recovery email address a new password, or a verification code will be generated for the user to input to access the account.

---

[1] *See Yahoo's Privacy Policy*, available at https://policies.yahoo.com/us/en/yahoo/privacy/index.htm.

11.     In my training and experience, I know that e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  Such information may constitute evidence of the crimes under investigation because it can be used to identify the account's user or users.

12.     Yahoo typically retains certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the methods used to connect to the account, and other log files that reflect usage of the account.[2]  In addition, e-mail providers often have records of the IP addresses used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.  Therefore, the computers of Yahoo are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for Yahoo subscribers) and information concerning subscribers and their use of Yahoo services, such as account access information, e-mail transaction information, and account application information, all of which would be helpful for the investigation to uncover new evidence of the crime, learn who uses the account and from where, and identify coconspirators.

---

[2] *See Yahoo's Privacy Policy*, available at https://policies.yahoo.com/us/en/yahoo/privacy/index.htm.

13. Based on my experience and training, I know that information stored in connection with a Yahoo account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of a crime or, alternatively, to exclude the innocent from further suspicion. As such, the information stored in connection with a Yahoo account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, web histories, email communications, contact lists, and images sent (and the data associated with the foregoing, such as date and time accessed or created) may indicate who used or controlled the account at a relevant time.

## THE MEDICAID AND MEDICARE PROGRAM

14. Medicaid is a joint federal and state health care program providing benefits to eligible low-income adults, children, pregnant women, elderly adults, and persons with disabilities. In Kentucky, Medicaid is funded by both federal and state governments and is administered by the Kentucky Cabinet for Health and Family Services, consistent with federal guidelines and requirements.

15. Medicaid is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

16. Medicaid covers the costs of physicians' services, outpatient care, and other services, including diagnostic laboratory testing. Diagnostic laboratory testing, including urine drug testing, is covered by Medicaid if it is medically necessary. A service is medically necessary if, *inter alia,* it is (a) based on an individualized assessment of the recipient's medical needs; (b) reasonable and required to identify, diagnose, or treat a disease, illness, or other medical condition; (c) appropriate in terms of the service, amount, scope, and duration based on

generally accepted standards of good medical practice; and (d) provided for medical reasons rather than the primarily the convenience of the individual, the individual's caregiver, or the health care provider. *See* 907 KAR 3:130, Section 2.

17. The Kentucky Department of Medicaid Services contracts with managed care organizations ("MCO's") to administer the Medicaid program in Kentucky, and health care providers must be credentialed with those MCOs in order to receive reimbursement for the services provided. The MCOs may impose additional coverage requirements prior to reimbursing for urine drug testing. For example, Humana-Caresource's Medicaid requirement policy states that urine drug testing performed pursuant to "blanket orders" or "standing orders" will not be reimbursed, nor will urine drug testing performed as a program requirement to live in a residential facility or sober center. Passport Health Plan's guidance states that "[s]tanding orders for specific test panels across members, 'routine panels' or 'custom panels' do not meet medical necessity criteria as they are not individualized to members' specific medical needs." Aetna Better Health of Kentucky guidance similarly describes standing orders for large drug test panels as "Medically inappropriate drug testing."

18. Medicare is a federally funded health care program providing benefits to persons aged 65 and older, persons with permanent kidney failure, and persons receiving social security benefits. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services ("HHS").

19. Medicare is also a "health care benefit program," as defined by 18 U.S.C. § 24(b). Medicare Part B covers the costs of physician's services, outpatient care and other services, including diagnostic laboratory testing.

20.     Medicare only pays for services that are reasonable and necessary for the diagnosis or treatment of illness or injury. *See* 42 U.S.C. § 1395y(a)(1)(A). In the context of diagnostic testing, including genetic testing, the relevant regulations state that "[a]ll. . . diagnostic laboratory tests. . . must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." 42 C.F.R. § 410.32(a).

## PROBABLE CAUSE

21.     In February 2019, the Lexington Police Department (LPD) received a complaint from the Director of Homelessness of the Lexington-Fayette Urban County Government that an organization called 1st Choice Healthcare ("1st Choice") was potentially exploiting individuals in the homeless population in Lexington, Kentucky by recruiting them to participate in behavioral health treatment for alcohol and drug dependency in exchange for free housing, then billing Medicaid for these services.

22.     The LPD investigation revealed that on or about February 1, 2019, 1st Choice representatives paid the initial rent for multiple units in the Fayette Crossing Apartment complex in Lexington, Kentucky, using a check from United Youth Care Services (UYCS), an organization out of North Carolina. According to the LPD investigation, after less than 2 months, the individuals living in Fayette Crossing Apartment complex in the rooms paid by UYCS were moved to Tates Creek Crossing Apartments and continued to participate in 1st Choice programs.

23. In December 2019, an individual wishing to remain anonymous reported to agents that 1st Choice closed its office located at 2432 Regency Road, Lexington, Kentucky, and patients were moved to a new program being operated at a new location within an apartment building on Daniel Court in Lexington, Kentucky.

24. On December 20, 2019, at 9:30 am, I conducted surveillance near 2033 Daniel Court, Lexington, Kentucky. A black female was seen exiting the apartment building located at 2033 Daniel Court and getting into the driver's seat of a sedan, North Carolina passenger plate PKM4449, while carrying what appeared to be two FedEx packages. A computer check of the license plate revealed the vehicle was registered to an individual named Delores Jordan. Jordan had been listed as a subject in the FBI Charlotte Field Office investigation involving UYCS and several subsidiaries, operating in North Carolina, for falsely billing Medicaid for unnecessary services, such as drug treatment and urine drug screenings.

25. A search of the Kentucky Secretary of State website revealed Jordan is listed as the registered agent and organizer for a company entitled Serenity Keepers, LLC located at 2033 Daniel Court, Suite 1, Lexington, Kentucky, 40504, organized on August 20, 2019.

26. On January 10, 2020, the investigation obtained authorization to install a pole cam near 2033 Daniel Court, Lexington, Kentucky, 40504. The pole camera footage captured individuals coming and going from 2033 Daniel Court, the apartment building in which the Serenity Keepers office exists, in groups. These instances usually occurred in the morning on weekdays.

27. On February 11, 2020, I interviewed a former patient of Serenity Keepers, with the initials D.R. D.R. explained he resided at an apartment near Serenity Keepers office while enrolled in the drug treatment program beginning sometime in the Fall of 2019. A staff member of Serenity

Keepers, DeSean Alexander, instructed D.R. and others enrolled with WellCare insurance, to list an Advanced Practice Registered Nurse (APRN) named Dawn Carpenter as their primary care physician on WellCare insurance enrollment documents.

28. D.R. advised Serenity Keepers staff conducted routine urine drug screenings on him and others enrolled in the program onsite. D.R. was with the program for approximately two months, but he never met APRN Dawn Carpenter. Nor did D.R. ever meet with a health care professional.

29. Another individual, with the initials W.H., explained she was enrolled in the Serenity Keepers program beginning in November 2019 and continuing for approximately six weeks. According to W.H., staff members at Serenity Keepers assisted W.H. in enrolling in Humana-Care Source Medicaid insurance. Delores Jordan, the program facilitator, met with W.H. and others in the Serenity Keepers program and informed them a counselor would be assigned to them. During W.H.'s six weeks at Serenity Keepers, W.H. had group therapy classes with a peer support specialist, but she never met with a counselor. W.H. did not meet with any medical professionals during her time at Serenity Keepers. W.H. estimated Serenity Keepers staff conducted only two urine drug screenings on her during the six weeks she was there.

30. An auditor with the State of Kentucky, Office of the Attorney General, Office of Medicaid Fraud and Abuse, examined Medicaid billing data for APRN Dawn Carpenter, looking for urine drug test referrals. The Medicaid claims data indicates Carpenter referred a large number of individuals for urine drug screenings to Biotap Medical Laboratory and Aria Diagnostics Laboratory. The majority of the referrals in 2020, over 10,000, were made to Aria Diagnostics. The medical billing codes for many of the specimens included a Presumptive test billing code (80307) and a Definitive test billing code (Primarily G0483). Based on my training and

experience, I know a Presumptive urine drug screening to establish only that there is a presence of drugs, while a Definitive test, or confirmation test, is used to identify specific medication in the specimen. The amount billed in 2020 by Aria Diagnostics for these claims, using Carpenter's NPI, was over $4,500,000 in 2020.

31.  Among the beneficiaries listed as being referred for drug screenings by Carpenter were patients D.R. and W.H. The data showed that between September 16, 2019 and November 11, 2019 APRN Carpenter referred D.R. for drug screenings on twelve different dates. Between December 20, 2019 and April 1, 2020, Carpenter referred W.H. for drug screenings on thirteen different dates.

32.  On or about September 3, 2020, I interviewed APRN Carpenter. She explained while operating as a nurse practitioner in the state of Kentucky, Carpenter was approached by Lily Timberlake, a medical sales representative, on or about September 1, 2019. Timberlake presented Carpenter with an opportunity to work in a part-time manner as a Medical Director for Serenity Keepers. Carpenter was previously unfamiliar with Serenity Keepers.

33.  According to Carpenter, Timberlake explained the duties of medical director for Serenity Keepers would involve Carpenter seeing patients enrolled in the sober living program several times a month and reviewing the urinalysis laboratory results of these patients. On or about September 10, 2019, Timberlake emailed Carpenter a Microsoft Word document from email account LILYSTIMBERLAKE@YAHOO.COM. This document was a letter Timberlake asked Carpenter to sign detailing the above-mentioned duties of the medical director for Serenity Keepers. Carpenter was unsure of who drafted the letter. The letter described the duties of the Medical Director for Serenity Keepers. These duties included; having patients enrolled in the program submit to frequent urine drug screenings, seeing the patients twice a month in person and

once a month through telemedicine, and keeping all medical records stored in a locked file cabinet at Serenity Keepers. Carpenter could not remember if she signed the letter and sent it back to Timberlake.

34.     Between September 2019 and October 2019, Carpenter twice went to the offices of Serenity Keepers to see patients. Timberlake accompanied Carpenter to the visits. While there, Carpenter was introduced to the owner of Serenity Keepers, Delores Jordan. Carpenter saw a number of patients during each visit. Timberlake was particularly interested in Carpenter having patients tested for sexually transmitted diseases (STD's). Following the first visit to Serenity Keepers, Carpenter received an email from LILYSTIMBERLAKE@YAHOO.COM with a form attached. The form was from a company called Biotap Medical, a medical laboratory based in Louisville, Kentucky, and was a "provider acknowledgement form" for the authorization of testing urine for STD's. Timberlake asked Carpenter to sign the form as the provider.

35.     On or about November 15, 2019, Carpenter began receiving emails from staff at Biotap Medical requesting copies of medical notes to support medical necessity of 140 urine specimens backlogged at Biotap Medical. The email indicated staff at Biotap Medical attempted to get the notes from "Delores," but "Delores" indicated Carpenter would have the notes. Carpenter told me she never authorized the laboratory referral of 140 urine specimens. Carpenter estimated she may have authorized 30 referrals for drug screenings over the two days she was at Serenity Keepers. Carpenter said she never received or reviewed any results of drug screenings from Biotap Medical.

36.     Carpenter was asked if she has ever referred patients to Aria Diagnostics for urine drug screenings. Carpenter advised she has never referred patients to Aria Diagnostics, nor has she ever heard of the laboratory.

37. Carpenter provided consent for the affiant to review her cellular telephone. As part of this review, SMS messages, among other data, were copied from the phone. A review of the SMS messages revealed several conversations between Carpenter and Timberlake. Carpenter advised Timberlake provided him/her with a phone number of (502) 930-3630. The affiant located this phone number in Carpenter's contact list under the name of "Lily Timberlake". An analysis of phone data revealed an SMS message exchange between Carpenter and Timberlake. The exchange occurred between November 11, 2019 and November 15, 2019. The following are messages sent during that exchange.

11/11/19 – Timberlake – *"Hi there, sorry to bother u – Deloris asked if she can give your contact info to Biotap?"*

11/11/19 – Carpenter – *"Lets talk about it when I see you if that's ok."*

11/15/19 – Carpenter – *"Lily I cannot do that with serenity keepers. Biotap is wanting notes on a bunch of the pts. I do not have notes on everyone. I just can't keep up with those people. They come and go too much."*

11/15/19 – Timberlake – *"As far as Biotap, have they talked to you?"*

11/15/19 – Carpenter – *"They sent me an email this evening."*

11/15/19 – Timberlake – *"Because I know they were having all patients fill out your registration papers and stuff to begin the process but wasn't sure what they are asking for."*

11/15/19 – Timberlake – *"Meaning Serenity Keepers"*

11/15/19 – Carpenter – *"They want office notes. I have not seen all of these pts. I think she needs to find someone else to do it. I just don't have time to go up there or get all the*

*telemedicine set up. It's a great opportunity, but I am starting to get busier and worth it just being me, I can't keep it all up."*

11/15/19 – Timberlake – *"Would you happen to know any NP's that would be interested?"*

11/15/19 – Timberlake – *"She wanted me to ask you."*

11/15/19 – Carpenter – *"No not really. I'm sorry, but it just more that I expected from what you told me at first."*

38. Following this exchange, Carpenter did not see any additional patients at Serenity Keepers. Carpenter indicated all referrals made using her NPI number to Aria Diagnostics were done without her authorization. Carpenter said she has never received a drug screening from Aria Diagnostics, Biotap or anyone at Serenity Keepers for her review. Carpenter is not aware of any medical personnel that were on staff at Serenity Keepers during the time these urine drug screenings were ordered. The most up to date Medicaid data indicates Carpenter's NPI number is still being used fraudulently to refer patients for drug screenings.

39. On January 7, 2021, I interviewed a current patient of Serenity Keepers, with the initials A.J. A.J. explained that she has been enrolled at Serenity Keepers since approximately June 2020, located at 2033 Daniel Court, Lexington, Kentucky. A.J. explained the program is run by "Ms. Delores" and that Ms. Delores's son, Mr. Harris, runs the day to day operations of Serenity Keepers. A.J. explained she participates in group therapy with a peer support counselor and there are approximately 30 people enrolled in the program, living in the 7-8 units rented by Serenity Keepers. A.J. told me that she has never met with a medical professional in the six months she has been enrolled in the program. A.J. informed me that she does submit to urine drug testing twice a week, but that the results are not reviewed by a medical professional.

40. According to the most recent Medicaid data available, between July and November, 2020, Aria Diagnostics billed approximately $37,000 for urine drug testing of 39 samples for patient A.J., all billed using Carpenter's NPI number as the referring provider.

41. Thus, there is probable cause to believe that evidence related to the crimes described herein will be found in records and information related to the account LILYSTIMBERLAKE@yahoo.com.

## CONCLUSION

42. Based on the facts set forward in this affidavit, there is probable cause to search information associated with the Yahoo account, as described in Attachment A, for evidence and instrumentalities of crimes, as described in Attachment B.

43. Based on the investigation to date, I submit that probable cause exists to believe that the email account listed in Attachment A, will contain evidence and instrumentalities of crimes, as described in Attachment B, regarding the FBI's ongoing investigation into the offenses listed above. Because the warrant will be served on Oath Holdings Inc., which will then compile the requested records at a time convenient to them within 14 days of the execution of the search warrant, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. Under 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

44. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B. The examination may require techniques including, but not limited to, computer-assisted scans, that might expose many parts of the data to human inspection in order to determine whether it is evidence described by the warrant.

45. This application seeks a warrant to search all responsive records and information under the control of Oath Holdings Inc., a provider subject to the jurisdiction of this court, regardless of where Oath has chosen to store such information.

46. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

**Signed remotely per FRCP 4.1.**
David J. Lowery, Special Agent
Federal Bureau of Investigation

SWORN and SUBSCRIBED to before me on this ___27th___ day of January, 2021.

Honorable Matthew A. Stinnett
United States Magistrate Judge
Eastern District of Kentucky